DORIS HOGGE, Plaintiff-Appellant, v. CHAMPION LABORATORIES, INC., Defendant-Appellee.

Fifth District   No. 5—88—0354

Opinion filed October 13, 1989.

Sharon A. Knapp, of Carr, Korein, Schlichter, Kunin & Montroy, of East St. Louis, for appellant.

David K. Frankland, of Albion, and Thomas O. Magan and Jeffrey W. Ahlers, both of Kahn, Dees, Donovan & Kahn, of Evansville, Indiana, for appellee.

JUSTICE LEWIS delivered the opinion of the court:

The plaintiff, Doris Hogge, appeals from a judgment of the trial court entered in favor of the defendant, Champion Laboratories, Inc. (hereafter referred to as Champion), following a bench trial. She presents for review the following four issues, which we quote:

"1. Whether an employee manual which imposes obligations on both the employer and employee binds the employer and its provisions?

2. Whether the employment application is incorporated into the contract between the employer and employee?

3. Whether a contract between the employer and employee may extend to and govern behavior affecting the employee and the State of Illinois?

4. Whether the employer, with timely notice of a breach, waives its right to enforce the contract by waiting more than three (3) years to exercise that right."

Many of the facts of this cause are undisputed, among them the following. In December of 1982 or in January of 1983, while the plaintiff was employed by the defendant, she was laid off for a brief period for defendant's taking of inventory. During that time she applied for and received unemployment benefits paid to her by the State of Illinois. When she returned to work for the defendant she continued to apply for and to receive unemployment compensation, while working for the defendant full time, until August of 1983, when the payments were discontinued by the State of Illinois. Thereafter, action was taken by the State of Illinois against her to recover the amount of unemployment compensation paid her while she was working for the defendant. On January 13, 1986, the State filed a complaint against her in the circuit court of Wayne County seeking payment of $4,754, the amount of the overpayment she had received. The defendant herein was not a party to that cause of action. A local newspaper carried an account of this action by the State against plaintiff, which appeared early in June of 1986. One or more clippings of the news story appeared on one or more bulletin boards at the defendant's plant where plaintiff worked. Thereafter the plaintiff was called to the office of defendant's director of personnel concerning the information contained in the newspaper article, was advised that she would be suspended for five days, and was terminated from

employment on June 13, 1986.

In her complaint she alleged, *inter alia*, that on May 16, 1983, August 15, 1983, and November 15, 1983, the defendant had received notices indicating times during which she was paid unemployment benefits while she was not unemployed. She alleged further that on June 13, 1986, she was discharged from the defendant's employ and that the reason given was that defendant had recently learned that the plaintiff had collected unemployment benefits from the State of Illinois chargeable to the defendant from January 15, 1983, through August 27, 1983. The defendant admitted in its response to the plaintiff's request for admission that on those three dates in 1983 it had received a notice "indicating periods in which plaintiff was paid benefits."

At trial the plaintiff called as a witness Dudley Willis, the defendant's director of human resources, who described the plaintiff as a "factory employee" assembling filters and stated that the purpose of the defendant's Employee's Manual (hereafter referred to as the Manual), which was admitted into evidence, was to provide to employees an "overview" of those matters presented to them during orientation. On page 23 of the Manual the following statements appear:

> "The following enumerated reasons for disciplinary action up to and including discharge is [*sic*] by way of illustration and is [*sic*] not to be deemed to exclude management's right to discharge employees for any other reason.
>
> MAJOR OFFENSES which due to their severe nature result in immediate suspension with possible discharge:
> * * *
> 7. Willful falsification or misrepresentation of employment, pay, production or other Company records."

Nine other items are listed under "MAJOR OFFENSES," including theft of property of the company or fellow employees; the use or possession of intoxicants or narcotics on company property; defacing or destroying company property or equipment; immoral or indecent behavior, including unwelcome sexual advances, requests for sexual favors, and other verbal or physical conduct of a sexual nature; fighting or engaging in physical violence on company property, intimidating or coercing other employees or creating discord; leaving the plant without permission except at authorized times; gross negligence in performing assigned duties; insubordination; and causing an unsafe condition or endangering the safety of another employee. Asked the purpose of the list of 10 items under "MAJOR OF-

FENSES," the witness answered, "To illustrate situations to employees where suspension and possible discharge can occur for various misconducts." Asked why item seven was included in the Manual, the witness responded, "[L]ike the other paragraphs in—in the manual, and under the offenses, they were written as one illustrations [*sic*] and purposely made broad because it would have been difficult then as it would be now to delineate, you know, a long laundry list of all the things that would come to mind. So, it was—it was intended to be broad to give employee, you know, some notion as to, you know, the—the type of offense that we're talking about." The Manual concludes with the following statements:

"This handbook serves only to outline Champion's major employment policies. It is not intended, and shall not be considered all inclusive or construed as an employment contract. This handbook reflects the company policy at the time of publication. The Company, of course, may improve or change these policies and reserves the right to do so at any time."

The witness read from a letter, admitted into evidence, sent to the plaintiff by certified mail on June 10, 1986, which states in part as follows:

"As a result of information recently brought to our attention, we met with you on June 6, 1986, for the purpose of allowing you to explain, justify or refute out data indicating that you collected State Unemployment Benefits chargeable to Champion during the period of January 15, 1983[,] through August 27, 1983. This was despite the fact that during this same period you were actively employed and collecting wages from Champion. Your failure and/or inability to explain, refute or otherwise justify this matter resulted in the action we have taken.

As you were told, to again afford you the opportunity to appeal our decision for subsequent termination to Mr. C. Casaleggi, Senior Vice President of Operations, you were placed on a five working day suspension, which covers the work week of June 9 through June 13. Pending your appeal and reversal by Mr. Casaleggi, your employment and all benefits will terminate effective June 13, 1986. As you were told, this action is a consequence of your direct violation of Item No. 7 under the Major Offenses on page 23 of the Employee Handbook, which states:

'MAJOR OFFENSES which due to their severe nature result in immediate suspension with possible discharge:

7. Wilful falsification or misrepresentation of employment, pay, production or other Company records.' "

The letter was signed by Mahlon E. Hallam as defendant's personnel manager.

The witness testified concerning a form submitted by defendant to the Division of Unemployment Insurance of the Bureau of Employment Security of the Illinois Department of Labor, dated August 26, 1983, and admitted into evidence as plaintiff's exhibit D. The form, which is labeled "Employer Notice of Possible Ineligibility," states the name of the worker as "Doris E. Hogge." It was submitted in response to a notice received by the defendant from the State of Illinois indicating that Doris Hogge had applied for unemployment compensation. The defendant's personnel manager, Mahlon Hallam, had signed the form on August 26, 1983, in Albion, Illinois, and had returned it to the State of Illinois with the following notation: "Doris E. Hogge is a full time employee. Her employment has been uninterupted [sic]. Therefore, we are puzzled as to why she is filing." The witness stated that defendant has two offices in Illinois, the one in Albion and one in West Salem. Defendant's accounting department and main payroll department are located at the corporate office in West Salem, which receives, in the words of the witness, "the record of who is receiving the [unemployment] benefits." He testified that the office in Albion receives "the individual initial claims" for "those people employed out of Albion," as was the plaintiff. However, information as to whether the employee receives benefits "does not come back to Albion" but goes to the West Salem office. With regard to this matter the following questions were asked on cross-examination and these answers were given:

"Q. But the Albion office would not have received any information about whether Doris Hogge was receiving benefits at that time or not, is that correct?

A. That is correct. What the Albion office received is their—I'm looking for the number, I think it's a [Form] BIS 31, and that—that went to the employing, if you will, division, the Albion plant. Most other state forms coming in would go to our corporate offices in West Salem.

Q. So, the notices of those people receiving benefits goes to your corporate office at West Salem?

A. That's correct."

He testified that "the Albion personnel department would receive certain documents, such as, I think one that indicated [sic] here earlier[,] the BIS 31, or whatever it is." Asked, "Now, when was the

first time the company [defendant] put together the fact that Doris Hogge had received benefits at the same—in 1983 at the same time she was receiving—or working full time for them?" the witness responded:

"First time it all came together was when we seen [sic] the newspaper article that was posted on the bulletin boards, and then we did some checking and confirmed what was happening. Prior to that, we had no knowledge in the Albion plant. The only thing that they had received was the—the one notice in which Mr. Hallam subsequently responded to, and received—and indicated earlier, we didn't receive anything after that from the State."

He testified that the article appeared in the newspaper on about June 2, 1986, and appeared "on the walls of the company" on about June 6, 1986. The plaintiff made no appeal to Mr. Casaleggi, as described in the letter, and was terminated from employment with the defendant on June 13, 1986.

The plaintiff testified that she had been given a manual essentially like the one in evidence when she began to work for the defendant in 1974. Asked, "What was important to you about coming to work for Champion?" she answered, "Well, the fact that they hand out a handbook is more than some companies do, and I felt like it was the same thing as a contract." Asked further, "And was that the reason you took the job, because of the benefits and the employee manual that was given to you on that day?" she answered, "Yes." She testified that on June 6, 1986, "[T]hey confronted me over the newspaper," referring, to Mahlon Hallam, Dudley Willis, and Steve Storkman, the plant supervisor. Asked, "Did you contest the fact that you had received unemployment benefits in 1983?" she responded, "No, not really." She testified that she had not appealed to Mr. Casaleggi " '[c]ause I didn't feel like I had to *** [b]ecause they knew it all along." Asked, "How do you know that?" she answered, "Because it was in my papers."

She testified on cross-examination that she thought when she came to work for the company that she was hired for "as long as I done [sic] my job." An application for employment admitted into evidence, signed by the plaintiff and dated January 28, 1974, stated immediately above her signature,

"I authorize investigation of all statements contained in this application. I understand that misrepresentation or omission of facts called for is cause for dismissal. Further, I understand and agree that my employment is for no definite period and

may, regardless of the date of payment of my wages and salary, be terminated at any time without any previous notice."

The plaintiff was employed briefly by the defendant for about three months in 1974 and left voluntarily to take another job. Thereafter, on February 23, 1976, she applied for employment with defendant, which application is signed by her and admitted into evidence. The same statement as that quoted above from the application of January 28, 1974, appears immediately above her signature. She began employment again with the defendant in August of 1976 and remained in the defendant's employ until termination on June 13, 1986. She received a copy of the Manual both times she began employment with the defendant. The newspaper article was, she said, the first public notice made of her having received unemployment benefits while employed by the defendant.

The defendant called as a witness Mahlon Hallam, who testified that when he received notice from the District Division of Unemployment concerning the plaintiff's application for unemployment benefits he was surprised because "Doris was an active, fully employed employee at the time." He said that "we responded over the phone to the Mt. Vernon—Mt. Vernon office [of the Division of Unemployment Insurance] and then followed up with [plaintiff's exhibit D]." He heard nothing further concerning the matter from the State of Illinois and was never notified of any hearing concerning the matter. It would have been his responsibility, he said, to handle such matters. He had received no notices prior to August 26, 1983, and it was his job at that time to respond to all such notices. He testified that he first learned the plaintiff had been receiving unemployment benefits through the newspaper article that appeared early in June of 1986, was placed on the bulletin boards of the plant, and was then provided to the personnel office. As a consequence of receiving this information, the witness immediately requested that the defendant's accounting office check the statements from the State of Illinois to see whether unemployment benefits had been paid to plaintiff and check her wages during that time to verify that she had, in fact, been receiving wages at the same time. He received a report indicating that she had collected unemployment and wages during the same period and thereupon took action concerning the matter. He testified that "[a]ll employees were employed for no definite period of time and were considered to be at will employees" and that to his knowledge there was never any specific written employment agreement for any employee.

In a six-page memorandum of decision, the trial court entered

judgment against the plaintiff. The court found that the plaintiff was an employee at will, stating further:

> "This would give the defendant the right to terminate the plaintiff's employment without cause. The plaintiff urges, however, that the employer's right to terminate is qualified by the provisions of the employee's manual. Assuming for the purposes of this case that plaintiff's argument is correct, nevertheless the court finds that the defendant has not violated the provisions of the employee's manual."

With regard to the plaintiff's contention that she did not falsify any company records and that her conduct does not, therefore, fall within the conduct described in paragraph seven under "MAJOR OFFENSES," the court concluded that, even if the statement is literally correct, it nevertheless constitutes a misreading of paragraph seven and that the plaintiff's admitted conduct is "either proscribed by the manual or[,] at the very least, is the same type of conduct which the manual cites as grounds for termination." The court noted that the Manual "clearly indicates that the causes of termination are only illustrations." Concerning the plaintiff's contention that if there was cause given for termination in 1983, the defendant's failure to take action for approximately three years constitutes *laches* or a waiver of the cause and the right to terminate, the court stated that the plaintiff had not shown a preponderance of evidence to indicate that the defendant did, in fact, know that unemployment benefits were being paid to the plaintiff. The court expressly found that the plaintiff was terminated for cause and that, if the defendant was obligated to comply with the terms and conditions of the Manual, it had not failed to do so and had not violated those provisions.

Upon plaintiff's motion for reconsideration, the trial court noted that no new or different information had been furnished and that the plaintiff stressed the erroneous interpretation of the facts developed at trial. The court confirmed its prior memorandum of decision and denied the plaintiff's motion to reconsider. The plaintiff's appeal followed.

With respect to the first three issues plaintiff presents for review, the essential question to be determined is whether the Manual constitutes a contract of employment between plaintiff and defendant. Although plaintiff does not contend that her "original agreement" to work for defendant specified any duration, she maintains that the Manual distributed when she began to work for defendant governs the employment relationship between the parties. She argues that, in spite of defendant's denouncing of the provisions of the Man-

ual as not binding upon it, defendant cited a provision in the Manual to support its termination of her; she urges that defendant's "selective application of the Manual provisions and its convenient interpretation of the binding nature of the manual should not be condoned." She seems, in sum, to take the position that she was not an employee at will, that the Manual should be interpreted as a contract, and that she could be terminated for any of the reasons enumerated therein but for no other.

The defendant takes the position that the plaintiff was employed for an indefinite term and was, therefore, an employee at will, dischargeable at any time with or without cause. Defendant contends that the Manual was not a contract of employment and that, assuming *arguendo* that it was, the trial court ruled properly that defendant did not violate its provisions.

■■ ■ Under Illinois law a written or oral employment contract that does not specify the term of employment creates an employment relationship that endures at the will of the parties and is terminable by either the employer or the employee at any time without cause, subject only to independent contractual or statutory provisions. (*De Fosse v. Cherry Electrical Products Corp.* (1987), 156 Ill. App. 3d 1030, 510 N.E.2d 141.) The rule in Illinois is that an employment relationship at will can be terminated for " 'a good reason, a bad reason, or no reason at all.' " (*Criscione v. Sears, Roebuck & Co.* (1978), 66 Ill. App. 3d 664, 669-70, 384 N.E.2d 91, 95, quoting *Loucks v. Star City Glass Co.* (7th Cir. 1977), 551 F.2d 745, 747.) Where an employee is hired for an unspecified period of time, a presumption arises that the employee's status is that of an employee at will; that presumption, however, can be rebutted by a showing that the parties contracted otherwise. (*Duldulao v. Saint Mary of Nazareth Hospital Center* (1987), 115 Ill. 2d 482, 505 N.E.2d 314; see *Land v. Michael Reese Hospital & Medical Center* (1987), 153 Ill. App. 3d 465, 505 N.E.2d 1261.) In *Duldulao* our supreme court held that an employee handbook or other policy statement creates enforceable contractual rights if the traditional requirements for contractual formation are present.

> "First, the language of the policy statement must contain a promise clear enough that an employee would reasonably believe that an offer has been made. Second, the statement must be disseminated to the employee in such a manner that the employee is aware of its contents and reasonably believes it to be an offer. Third, the employee must accept the offer by commencing or continuing to work after learning of the policy

statement. When these conditions are present, then the employee's continued work constitutes consideration for the promises contained in the statement, and under traditional principles a valid contract is formed." (*Duldulao*, 115 Ill. 2d at 490, 505 N.E.2d at 318.)

All three conditions set forth in *Duldulao* must be present to create enforceable contract rights. (*Koch v. Illinois Power Co.* (1988), 175 Ill. App. 3d 248, 529 N.E.2d 281.) In the instant case the first condition, or requirement, is not satisfied because the Manual does not contain a promise clear enough that an employee would reasonably believe that an offer has been made.

■ In *Duldulao* the court noted that the handbook there contained no disclaimers to negate the promises made and that, in fact, the introduction to the handbook stated just the opposite, that is, that the policies in the handbook " 'are designed to clarify your *rights* and duties as employees.' " (Emphasis added.) (*Duldulao*, 115 Ill. 2d at 491, 505 N.E.2d at 319.) By comparison, the Manual here concludes with an express disclaimer that it "is not intended, and shall not be considered all inclusive or construed as an employment contract." In *Moore v. Illinois Bell Telephone Co.* (1987), 155 Ill. App. 3d 781, 508 N.E.2d 519, the court referred to the observation of the court in *Duldulao* that the handbook in question contained no disclaimers to negate the promises made. The court in *Moore* concluded that the employee could not reasonably have believed an offer had been made because the incentive plan in question stated, " 'The Plan is a statement of management's intent and is not a contract or assurance of compensation' " (155 Ill. App. 3d at 784, 508 N.E.2d at 521), thereby making it clear that the defendant was promising nothing in the incentive plan. As a result, the plan created no enforceable contractual rights. Similarly, the express disclaimer in the Manual stating that it is not to be construed as an employment contract could not reasonably give rise to the· belief that an offer had, in fact, been made.

Further, the Manual states not only that it is not to be considered "all inclusive" but also that the 10 reasons listed under "MAJOR OFFENSES" "for disciplinary action up to and including discharge [are] by way of illustration and [are] not to be deemed to exclude management's right to discharge employees for any other reason." Again, such a statement could not reasonably suggest that an employee could be discharged only for engaging in conduct described and proscribed by one of the 10 items enumerated therein. In *Martin v. Capital Cities Media, Inc.* (1986), 354 Pa. Super. 199, 511

A.2d 830, the handbook in question contained a section entitled "Standards of Conduct," which set forth a list of actions that, if engaged in by an employee, would lead to disciplinary action. Like the Manual here, the handbook there stated that the list was illustrative and did not include other just causes for disciplinary action. The court's observations in *Martin* apply equally to the case at bar:

"The handbook in the instant case does not evidence an intent to convert the employees who received it into employees who could only be discharged for an objective 'just cause.' The list of actions that call for disciplinary action set forth in the handbook, *supra*, are nothing more than common sense enumerations of actions that any reasonable at-will employee would understand to generally call for disciplinary action. The handbook is an aspirational statement by the employer listing actions that generally will not be tolerated; it serves an information function. Moreover, the handbook states very specifically that the reasons set forth are illustrative only and that the employer has the unilateral right to alter the handbook when he sees fit." 354 Pa. Super. at 214, 511 A.2d at 838.

For these reasons we conclude that the Manual created no enforceable contractual rights. Because all three conditions, or requirements, set forth in *Duldulao* must be present to create enforceable contract rights and the first of them is absent here, we need not consider the other two. The plaintiff here failed to rebut the presumption that her status was that of an employee at will by showing that she and the defendant had contracted otherwise. Thus, the trial court properly found her to be an employee at will. As such she was subject to discharge at any time with or without cause, at the option of the employer.

■ We turn to the final issue plaintiff raises, whether the defendant waived its right "to enforce the contract" by waiting to do so more than three years after receiving notice of a breach. She argues that the "right to retaliate" was waived because the defendant received notice of the acts complained of in May, August, and November of 1983 but took no action with regard to them until June of 1986. This issue, as stated, assumes the existence of a contract requiring cause for the dismissal of an employee. We have already determined that the Manual constituted no such contract and that the plaintiff was, as the trial court found, an employee at will dischargeable without cause at any time. Hence, we need not consider this issue. We do note, however, the fundamental rule that a court of review will not disturb the findings of a trial court unless they are

contrary to the manifest weight of the evidence (*Marth v. Illinois Weather-Seal, Inc.* (1977), 50 Ill. App. 3d 577, 365 N.E.2d 588); our examination of the entire record, including the admissions of the defendant and the evidence adduced at trial, reveals that the finding of the trial court concerning the plaintiff's failure to show by a preponderance of evidence that the defendant knew in 1983 unemployment benefits were being paid to her was in accord with the evidence.

Affirmed.

HARRISON and HOWERTON, JJ., concur.