**Doris J. HAYS, Plaintiff,**

v.

**BEVERLY ENTERPRISES, INC., Defendant.**

**No. C.A. 86–2183.**

United States District Court, W.D. Pennsylvania, C.D.

April 24, 1991.

Stephen D. Wicks, Altoona, Pa., for plaintiff.

Leonard Fornella, Polito and Smock, P.C., Pittsburgh, Pa., for defendant.

## MEMORANDUM OPINION

LEE, District Judge.

Plaintiff initiated this action by filing a Complaint in the Court of Common Pleas of Blair County, Pennsylvania, on or about September 9, 1986. Defendant, Beverly Enterprises, Inc., then removed the action to this Court.

Plaintiff, a licensed practical nurse, alleges in her Complaint that she was wrongfully discharged by her employer, defendant, in that her dismissal is in violation of public policy and was done with the intent to harm her. Specifically, plaintiff contends that her discharge was precipitated by (1) her disclosure of defendant's alleged failure to timely obtain medical care for one of its residents and (2) for her failure to adhere to what she characterizes as an improper method of disposing medications.

Defendant has filed a Motion for Summary Judgement and supporting Brief wherein it asserts that plaintiff's claims do not give rise to a cause of action under the applicable law of Pennsylvania. Defendant argues that plaintiff's claims do not fall within the public policy exceptions to the employment-at-will doctrine which permits an employer to discharge an employee without cause.

Defendant's Motion for Summary Judgment was originally filed on January 19, 1989, and denied by the Honorable Paul A. Simmons in an Opinion and Order dated July 7, 1989. The Court held that plaintiff's discharge, allegedly in retaliation for informing a patient's family that proper health care allegedly had not been given, would constitute a wrongful discharge in violation of public policy under Pennsylvania law. The Court analogized plaintiff's discharge to a situation involving a "whistleblower" who the Court opined was deserving of protection from termination.

On February 2, 1990, during a Status/Pretrial conference held by Judge Simmons, the merits of defendant's Motion for Summary Judgement were again discussed. At the close of that session, Judge Simmons agreed to reconsider his decision and invited defendant to renew or refile its Motion for Summary Judgment.

On or about March 6, 1990, defendant filed its renewed Motion along with an accompanying memorandum of law. At the conclusion of Argument on the Motion which was conducted on May 25, 1990, Judge Simmons indicated that he felt the legal parameters of the public policy exception to the employment-at-will doctrine were unclear and unsettled and suggested that the issue should be certified to the Third Circuit Court of Appeals pursuant to 28 U.S.C. § 1292(d). Before Judge Simmons could act on counsels' proposed Opinion and Order, this case was transferred to this member of the Court.

## BACKGROUND

Plaintiff received her GED in 1982 and was graduated from the Altoona Vocational Technical School with an LPN (Licensed Practical Nurse) certificate. After a year of clinical training at the Altoona Hospital, plaintiff passed her state board examinations in 1984. Plaintiff also holds a Nurses Aid certificate from a course she took at the Valley View Nursing Home. Prior to her position with defendant, plaintiff's work-related experiences included service as a nurse's aid at the Indiana and Altoona Hospitals, Seton Hill College, where she provided care for retired nuns, and the Valley View Nursing Home in 1984 where she first worked as LPN.

On May 1, 1986, plaintiff, began working for defendant as a part-time employee at the Hillview Chateau, a personal care boarding facility. The Beverly complex consists of the Hillview Convalescent Center, a facility providing intermediate and skilled care, and the Hillview Chateau, which is essentially a retirement facility. The complex has a resident physician whose duty it is to certify which of the two places better suits the needs of a resident.

Plaintiff was hired under a standard probationary period of 90 days.[1] Among her

---

1. Defendant's "Employee Handbook" contained a "90 Day Probationary Period" provision which reads:

numerous responsibilities, plaintiff's duties included patient care and the pouring and administration of medications. Her immediate supervisor was Linda Byers, a licensed practical nurse and the home's Personal Care Coordinator. Ms. Byers received Practical Nurses' Training from Clearfield Vocational Technical School from which she was graduated in 1975. She also received her LPN in 1975. Ms. Byers' health-care related work experiences include seven (7) years of providing private duty nursing care in individual homes and similar care in Clearfield Hospital in addition to her experience under the employ of Beverly which began in August of 1985 at Haida Manor. Ms. Byers was transferred to defendant's Chateau Hill facility in April of 1986.

On her first day of work, plaintiff was given Beverly's "Employee Handbook" and was instructed to familiarize herself with its provisions.[2] On May 19, 1986, plaintiff signed an Acknowledgement that she received and read copies of the facility personnel policies and understood them to be conditions of her employment.

Arthur and Grace Calvert, husband and wife, were residents of the Hillview Chateau Personal Care Boarding Home prior to the time plaintiff came to be employed by defendant. One Doctor Kaczor was Mrs. Calvert's designated treating physician.

In her deposition, Plaintiff indicates that on or about late May, 1986, she observed that Mrs. Calvert was experiencing breathing problems to such an extent that plaintiff felt compelled to notify her supervisor, Linda Byers. Plaintiff stated that Mrs. Calvert's condition did not appear to be acute, but that she wanted to report Mrs. Calvert's condition to her supervisor's attention and seek further instructions. Plaintiff reported that Mrs. Calvert's feet were "edemous, syonodic, and that the resident was breathing more heavily than she had noticed in the past."

Plaintiff states she was told by Linda Byers that Mrs. Calvert's condition "was all in her head." However, plaintiff acknowledges that her conversation with Byers also revealed that Mrs. Calvert's doctor prescribed certain medications, namely three placebos to facilitate the resident's breathing and minimize her discomfort.

Linda Byers' uncontroverted deposition testimony reveals the following history of communications between herself and Mrs. Calvert's treating physician. Between April 26, 1986 and the date Mrs. Calvert was admitted to Mercy Hospital, Byers and/or members of her staff spoke with Dr. Kaczor on six occasions.

On April 28, 1986, Dr. Kaczor was called by a member of defendant's staff, other than plaintiff, concerning Mrs. Calvert's apprehension about being in the home. In response to the call, Dr. Kaczor prescribed certain medications. On May 2, 1986, Dr. Kaczor received three calls from Linda Byers, one of which was precipitated by the findings of a visiting registered nurse whom the family had retained. The nurse noted that Mrs. Calvert had a productive cough and Dr. Kaczor ordered an x-ray and prescribed 500 mg of Ampicillin to be administered every six hours, and one teaspoon of Robitussin to be taken four times daily. The medications were to have commenced immediately. A member of defendant's staff, other than plaintiff, contacted Dr. Kaczor on May 5, 1986, to report on his patient's condition. It was not until June

---

**2.** Included in this handbook is the following pertinent provision:

All new employees will have a 90 day probationary period. This is effective on the first day of employment and ends on the 90th day. An employee can be discharged for any reason during the probationary period. Continued employment is contingent upon work performance, work record, and satisfactory reference checks. At the end of this period there will be a written evaluation. The employee is not eligible for any benefits until the 91st day.

"You must keep all information concerning our residents strictly confidential. *You are not permitted to disclose any information concerning the condition of a resident, his doctor's order, or nursing care received.* Questions about information normally considered confidential from the residents themselves, or their families, shall be directed to the nurse on duty and in turn to the administrator." (Emphasis Supplied).

10, 1986, that Dr. Kaczor was contacted again by Linda Byers. Parenthetically, we note Linda Byers' unrefuted testimony which indicates that Mrs. Calvert had a doctor's appointment sometime between April 28, 1986 and prior to her admission to Mercy Hospital.

Byers' deposition testimony revealed that on June 10, 1986, Mrs. Calvert complained of shortness of breath and that she had had a bad night. Byers observed that Mrs. Calvert's legs and feet were edematous with pitting edema and that her condition was measurably worse than the previous day. Byers contacted Dr. Kaczor's office who, in turn, instructed Byers to take Mrs. Calvert to the Emergency Room for an x-ray to be read immediately. Byers transported Mrs. Calvert to Mercy Hospital via her own car.

Linda Byers and Mrs. Calvert arrived at the hospital emergency room where Mrs. Calvert underwent blood work, x-rays and an electrocardiagram. Linda Byers departed the hospital without Mrs. Calvert. Hospital personnel advised Byers they would contact her regarding whether or not they intended to admit Mrs. Calvert for further treatment.

At 3:30 that afternoon, Linda Byers was called by the hospital and told that Mrs. Calvert was admitted with congestive heart symptoms as opposed to congestive heart failure. Mrs. Calvert was then taken to the Coronary Care Unit for observation. On June 20, 1986, Mrs. Calvert was discharged from the hospital and returned to Chateau Hill.

Following her days off, plaintiff reported to work on June 15, 1986. At this time, plaintiff encountered Betty Calvert, Mrs. Calvert's daughter-in-law, and plaintiff asked about Mrs. Calvert's condition. Arthur Calvert, Jr. advised plaintiff that his mother had been admitted to Mercy Hospital. He also asked plaintiff why her symptoms were not recognized earlier and why treatment had not been timely provided. Plaintiff responded that she had noticed these problems in the past and reported them to her supervisor, Linda Byers, and that it was up to Byers to take some action. She then referred the Calverts to her supervisor.

On June 16, 1986, a staff meeting was held at Hillview Chateau which was attended by plaintiff. At this meeting, plaintiff again raised her concerns about pre-pouring medications and the handling of Mrs. Calvert's case.

On June 18, 1986, plaintiff was presented with an Employee Memorandum containing a list of purported work deficiencies. Defendant informed plaintiff that in order for plaintiff to remain in defendant's employ, she needed to correct these deficiencies immediately.[3]

Plaintiff did not agree with her employer's assessment of these deficiencies and requested a meeting and the opportunity to call witnesses in order to defend herself against defendant's criticisms. No such meeting was held and on June 16, 1986,

---

**3.** A Beverly Enterprises "Employee Memorandum was issued on June 18, 1986 in which defendant sets forth the following allegations in support of its disciplinary action against plaintiff:

"Documentation of events:

June 14 & 15th/ Use of improper chain of command concerning information on residents care. Giving out more than general information.

June 15th/ Did not complete her job duties for that day as instructed by supervisor/prepouring 9am medications

June 15th/ Lack of support for management of Chateau concerning information on residents.

June 16th/ Stated at staff meeting she used documentation of Mrs. Calvert's con-

dition/very little documentation found concerning this

June 17th—Spoke with employee on phone @ approximately 12:00 noon. Made insinuation I was not telling truth concerning Mrs. Calvert's condition. She also stated she called Mercy Hospital and ask condition of this resident. Told me the information she received was resident in serious condition. Was upsetting to residents family and personnel of Chateau."

Plaintiff's signature acknowledging receipt of the above appears at the bottom of this list of allegations along with the following notation:

"I have read this statement and strongly disagree with its contents."

plaintiff was discharged from the defendant's employ.

## STANDARDS FOR SUMMARY JUDGMENT

Defendant has moved this Court to grant Summary judgment summary in its favor pursuant to Rule 56 of the Federal Rules of Civil Procedure.[4] In interpreting this Rule, the United States Supreme Court in *Celotex Corp. v. Catrett*, 477 U.S. 317, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986) has ruled that:

> "The plain language ... mandates entry of summary judgment, after adequate time for discovery and upon motion, against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial. In such a situation, there can be 'no genuine issue as to any material fact,' since a complete failure of proof concerning an essential element of the non-moving party's case necessarily renders all other facts immaterial." *Celotex*, 477 U.S. at 322 to 323, 106 S.Ct. at 2552 to 2553.

An issue of material fact is "genuine" only if the evidence is such that a reasonable jury could return a verdict for the non-moving party. *Anderson v. Liberty Lobby, Incorporated*, 477 U.S. 242, 248, 106 S.Ct. 2505, 2510, 91 L.Ed.2d 202 (1986). With these principles as our guide, we now turn to the merits of defendant's Motion.

## CAUSE OF ACTION FOR WRONGFUL DISCHARGE

Plaintiff's claims require an analysis of Pennsylvania law regarding the rights of an at-will employee under two exceptions to the at-will employment doctrine. Because the Pennsylvania Supreme Court has not taken a definitive position on either of claims raised herein, we are required to predict that Court's resolution of this dispute. *Robertson v. Allied Signal, Inc.*, 914 F.2d 360, 364 (3d Cir.1990).

Our review of the plaintiff's claims vis-a-vis two exceptions to the unqualified right of an employer to dismiss an employee at-will necessarily begins with the teachings of the Pennsylvania Supreme Court in *Geary v. United States Steel Corp.*, 456 Pa. 171, 319 A.2d 174 (1974).

George B. Geary, a salesman of tubular products used in the oil and gas industry, came to the conclusion that one of his company's products had been inadequately tested and constituted a serious danger to anyone who used it. Following his unsuccessful attempt to get his immediate supervisors to act on this problem, he pressed the matter to the vice-president in charge of the product line. The result of his efforts were twofold; the product was withdrawn from the market and Geary lost his job.

The *Geary* Court did not conclude that Geary's dismissal was contrary to public policy. In reaching its determination, the Court focused upon two factors; (1) Geary was not responsible for making judgments about product safety, and (2) Geary did not have expertise in that area.

However, the *Geary* Court did recognize, albeit in *dicta*, a common law restriction on an employer's power to discharge an at-will employee on public policy grounds when it opined:

> "It may be granted that there are areas of an employee's life in which his employer has no legitimate interest. An intrusion into one of these areas by virtue of the employer's power of discharge might plausibly give rise to a cause of action, particularly where some recognized facet of public policy is threatened.... [However, we] hold only that where the Complaint itself discloses a plausible and legitimate reason for terminating an at-will employment relationship and no clear mandate of public policy is violated thereby, an employee at will has no right of

---

**4.** Fed.R.Civ.P. 56 reads in pertinent part:
"[Summary Judgment] shall be rendered forthwith if the pleadings, depositions, answers to interrogatories and admissions on file, to-

gether with affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law."

action against his employer for wrongful discharge."

*Id.* 319 A.2d at 180.

This language has since been interpreted by the Third Circuit as implicitly recognizing that in appropriate circumstances such a cause of action for wrongful discharge might be maintained. *Woodson v. AMF Leisureland Centers, Inc.,* 842 F.2d 699 (3d Cir.1988); *Novosel v. Nationwide Insurance Co.,* 721 F.2d 894 (3d Cir.1983); *Bruffett v. Warner Communications, Inc.,* 692 F.2d 910 (3d Cir.1982); *Perks v. Firestone Tire & Rubber Co.,* 611 F.2d 1363 (3d Cir.1979).

*Geary* has been interpreted to hold that two limitations exist on an employer's unqualified right to dismiss an at-will employee: (1) a discharge that violates a clear mandate of public policy, and (2) a discharge precipitated by a specific intent to harm the employee without legitimate business justification. *Harrison v. Fred S. James, Inc.,* 558 F.Supp. 438 (E.D.1983); *Tourville v. Inter–Ocean Insurance Company,* 353 Pa.Super. 53, 508 A.2d 1263 (1986), allocatur denied, 514 Pa. 619, 521 A.2d 933 (1986); *Mudd v. Hoffman Homes For Youth,* 374 Pa.Super. 522, 543 A.2d 1092 (1988).

■  Plaintiff's allegation of defendant's specific intent to harm her is found in Paragraph 16 of plaintiff's Complaint which reads in relevant part:

"... and further that the plaintiff's dismissal was wrongful because it was effected with an intent to harm Plaintiff for her disclosures to the family of Mrs. Calvert and her candor and confrontation of management personnel in an open personnel meeting on June 16, 1986."

In *Geary,* the Pennsylvania Supreme Court wrote that specific intent can be successfully alleged if there is no other basis for the employer's action other than pure, unadulterated malevolence, or if the action was motivated by an ulterior purpose to harm the employee. Id. 319 A.2d at 178.

In the very least, any communication regarding the medical condition of a resident and/or the health care services provided to such an individual, must be accomplished in a controlled manner by competent physicians or those otherwise charged with a resident's care who possess special training or knowledge that would render that individual competent to make such a communication. In this light, we cannot say that plaintiff's dismissal, even if solely based upon her communication with the Calvert Family, gives rise to a cause of action for wrongful discharge under the specific intent to harm exception to the at-will doctrine. We are satisfied that defendant's decision to terminate plaintiff from her employment was, in part, sufficiently predicated upon its stated policy regarding confidentiality the breach of which presents a legitimate reason for termination.

In addition, there is nothing in the pleadings or the supporting depositions that could lead us to conclude that plaintiff has met either the "disinterested malevolence" or "ulterior purpose" criteria the Supreme Court in *Geary* intended as guidance. Simply stated, even if we accept all well pleaded material facts contained in the Complaint and the supporting depositions as true, those facts fail to support the alleged specific intent on the part of defendant to cause harm to plaintiff. At best, we perceive plaintiff's claim as a variant of the public policy claim she additionally maintains.

■  Since we must conclude that plaintiff has failed to establish a factual basis for a cause of action under the specific intent to harm exception to the at-will employee doctrine, we do not need to predict the position the Pennsylvania Supreme Court would take in resolving such a claim. Our focus is more appropriately fixed upon plaintiff's first claim that her discharge was violative of public policy.

In *Smith v. Calgon Carbon Corp.,* 917 F.2d 1338 (3d Cir.1990), the Court noted two recent Pennsylvania Supreme Court decisions which cast some doubt upon the continued efficacy of the *Geary* limited public policy exception to the employment at-will doctrine. See *Clay v. Advanced Computer Applications,* 522 Pa. 86, 559 A.2d 917 (1989); *Paul v. Lankenau Hospi-*

*tal,* 524 Pa. 90, 569 A.2d 346 (1990). Notwithstanding these observations, the *Smith* Court adhered to earlier decisions of this Circuit in stating that absent a clear statement by the Pennsylvania Supreme Court to the contrary or other persuasive evidence of a change in Pennsylvania law, we are bound by the several holdings of this Circuit which, under *Geary,* recognize the common law public policy restriction on an employer's right to discharge an at-will employee. *Id.* at 1343.

The *Smith* Court instructs us that a discharge may violate a "clear mandate of public policy" if it results from conduct on the part of the employee that is required by law or from the employee's refusal to engage in conduct prohibited by law. *Id.* at 1344.

Plaintiff cites to 55 Pa.Code Section 2620.35 as promulgated by Department of Public Welfare as the clear mandate of public policy which was violated by her discharge. This section, which is found under the Personal Care Boarding Home Service provision reads as follows:

§ 2620.35. Health Services

(a) If the resident suddenly becomes ill or injured and is unable to secure necessary care, the provider shall secure necessary assistance or care. Arrangements shall be made in advance between the provider and the resident regarding the physician or dentist and designated person or community agency to be contacted in case of illness or injury and the persons shall be contacted.

(b) If the resident's medical situation, as determined by a physician, indicates the need for a transfer to a health-care facility, the provider shall notify the resident's designated person and shall provide whatever assistance is necessary in making arrangements for the resident's transfer to an appropriate facility.

(c) The provider shall have first aid supplies, including bandages, adhesive tape, bandaids, cotton sterile dressings, antiseptics, applicators, safety pins, and scissors readily available and located together in the home.

Plaintiff frames the issue in her Brief in Opposition to Defendant's Renewed Motion for Summary Judgment as "whether plaintiff has stated a cause of action for wrongful discharge based upon the defendant's termination of plaintiff for her disclosure of the defendant's violation of the regulation"? We think such a question incorrectly presupposes that the regulation relied upon imposes a specific duty upon plaintiff.

In our view, plaintiff mischaracterizes the issue before us. The question we must decide is simply whether it can be said that plaintiff's discharge is predicated upon her conduct that is required by law or upon her refusal to engage in conduct that is prohibited by law. *Smith v. Calgon, supra.* at 1433.

In her Brief, plaintiff states that she was fired "in retaliation for a very specific discussion of her supervisor's failure to take action required by law." Plaintiff's contention, as stated, fails to trigger any applicability of the Department's regulation to the plaintiff. In determining that no legal duty under the regulation is conferred upon plaintiff, affirmative or otherwise, we note that section 2620.35(b) specifically requires a physician to diagnose the condition of a resident before the provider would be required to secure necessary assistance or care. No such duty is placed upon any member of defendant provider's staff. Moreover, we are satisfied that sound reasoning exists for defendant's "Confidentiality Information" policy in that it assures that any communication of a resident's condition, doctor's orders or nursing care received, is made in a controlled manner by someone competent to speak to particular questions. We do not read defendant's confidentiality provision as a method used to circumvent, deny or prevent family members from inquiring about the condition of one of its residents.

In sum, plaintiff's concern for Mrs. Calvert, while commendable, does not lessen defendant's legitimate interest in maintaining the policy stated in its Employee's Handbook (revised, June, 1985), Section V "Your Obligation To Your Job" under the subtitle, "Confidential Information."

## APPLICATION OF THE WHISTLE-BLOWER LAW

■ The facts as alleged by plaintiff do not entitle her to rely on the "whistleblower" law found at 43 Pa.S.A. § 1422. To be clear, this is not a case about a whistleblower. 43 Pa.S.A. § 1422 defines "whistleblower" as follows:

"**Whistleblower.**" A person who witnesses or has evidence of wrongdoing or waste while employed and who makes a good faith report of the wrongdoing or waste, verbally or in writing, to one of the person's superiors, to an agent of the employer or to an appropriate authority.

We have no difficulty in concluding that plaintiff's attempt to report her concern over Mrs. Calvert's condition to her supervisor was made in good faith.[5] Our focus is instead upon whether the basis of plaintiff's report to her supervisor concerned any wrongdoing as contemplated by the statute. "Wrongdoing" is defined in the statute as follows:

"A violation which is not of a merely technical or minimal nature of a Federal or State statute or regulation, of a political subdivision ordinance or regulation or of a code of conduct or ethics designed to protect the interests of the public or employer."

The regulation relied upon by plaintiff to establish defendant's "wrongdoing," by definition, places no duty upon defendant to prescribe treatment for Mrs. Calvert or to transfer her to a health care facility. Section "b" of the regulations specifically states that if the resident's medical situation, as determined by a physician, indicates the need for a transfer to a healthcare facility, the provider shall notify the resident's designated person and shall provide whatever assistance is necessary in making arrangements for the resident's transfer to an appropriate facility.

On at least six occasions, contact was made by defendant with Mrs. Calvert's treating physician who in turn prescribed necessary medications. There is also un-controverted testimony before us that Mrs. Calvert visited or was visited by her physician on at least one occasion relatively near in time to Mrs. Calvert's admission to Mercy Hospital.

The duty imposed by the regulation plaintiff cites was properly that of Dr. Kaczor who had been previously designated by the Calvert family as Mrs. Calvert's treating physician and it was to Dr. Kaczor that Linda Byers communicated on various occasion the condition of Mrs. Calvert.

Moreover, we find the instant facts to be closely analogous to the facts found in *Geary*, and we are persuaded by that Court's teachings that notions of "responsibility" and "expertise" must not be overlooked when determining whether a cause of action under the public policy exception should lie.

In conclusion, we find that plaintiff has failed to identify a genuine issue of material fact to support her claim of wrongful discharge based upon either the "whistleblower law" or the regulation as promulgated by the Department of Public Welfare. To be precise, plaintiff falls short of establishing a genuine issue of material fact that she was discharged for doing something that was required by positive law, or for refusing to do something that was prohibited by positive law, or that she was discharged for engaging conduct that was privileged under positive law.

Defendant's Motion for Summary Judgment is HEREBY GRANTED.

---

5. A good faith report is defined by Section 1422 as "A report of conduct defined in this act as wrongdoing or waste which is made without malice or consideration of personal benefit and which the person making the report has reasonable cause to believe is true."