Donald E. **SMITH**

v.

**CALGON CARBON CORPORATION**
**and Merck & Co., Inc.**

Appeal of **CALGON CARBON**
**CORPORATION.**

No. 89–3617.

United States Court of Appeals,
Third Circuit.

Submitted Pursuant to Third
Circuit Rule 12(6)
March 14, 1990.

Decided Oct. 31, 1990.

Walter G. Bleil, Reed Smith Shaw & McClay, Pittsburgh, Pa., for appellant.

Donald E. Smith, pro se.

Before SLOVITER, BECKER and STAPLETON, Circuit Judges.

## OPINION OF THE COURT

STAPLETON, Circuit Judge:

We here review a proceeding in which the plaintiff, Donald E. Smith, achieved a sizeable jury verdict on a Pennsylvania state law cause of action for wrongful discharge.[1] At trial, Smith, an at-will employee, argued that he had been dismissed because of certain activities he undertook on the suspicion that his employer, Calgon Carbon Company ("CCC"), had polluted water and air. The jury awarded Smith $222,000 in compensatory damages and $181,150 in punitive damages. The defendant now attacks both the legal and factual bases for plaintiff's award, and also appeals an allegedly misleading jury instruction. For the reasons stated herein, we will reverse the judgment of the district court and remand with instructions to enter judgment for the defendant.

## I. FACTUAL BACKGROUND

Donald Smith was employed by CCC and its predecessors for his entire adult life, working his way up from sweeping floors to his final position as Supervisor of Warehouse and Inventory Control, a low level management position. Smith's duties included keeping track of CCC's inventory of raw materials and finished product, both by taking physical inventories and by monitoring usage and deliveries. Smith's responsibilities also included preparation of monthly Production, Shipping and Inventory ("P.S.I.") reports, which were sent to corporate management.

CCC employed a yearly employee review system in which each employee was rated from one to five, with three being average. Over the course of his employment, Smith received generally favorable reviews, although in later years his average rating declined from four to three, and for some time his reviews commented on his inability to manage time efficiently, as well as on certain problems with his attitude towards superiors. Early in 1985 Smith's long-time immediate supervisor, with whom he had apparently had a good working relationship, retired, and Smith began reporting directly to the new plant manager, Will Bennett.

On October 30, 1985–approximately the time Smith's annual review was expected—Bennett instead gave Smith a memorandum entitled "Don Smith—Interim Review and Improvement Program." Joint Appendix at 680–82. The expressed purpose of this document was to "[a]ddress the development and continuation of excessive overtime." On March 7, 1986, Bennett gave Smith an "unsatisfactory" rating of two, and pursuant to company policy placed Smith on a "Performance Improvement Program" ("P.I.P."). This program involved detailed goal-setting and regular meetings with supervisors to review progress, with a new evaluation to be performed after three months. At the end of Smith's P.I.P., he again received a rating of two, and on June 13, 1986, was terminated.

Smith focuses on two separate incidents which he claims led to his dismissal. The first involves his discovery in October 1985 of what he believed to be a "spill" of over 73,000 pounds of caustic soda into the river adjacent to the plant. Caustic soda is a raw material used in vast quantities in the production of "IVP 4 by 6," a recycled charcoal product used in filters. The caus-

---

1. The district court had pendent jurisdiction over the state law claim by virtue of an ERISA claim (which was dismissed for want of evidence at the conclusion of plaintiff's case). We have jurisdiction pursuant to 28 U.S.C. § 1291.

tic is stored in a large storage tank outside the plant that can hold upwards of 100,000 pounds of the material. The only way to determine how much caustic is actually in the tank is to drop a cable down to determine the depth of the liquid and from that figure calculate the amount of caustic. Smith testified that he did not take these measurements very often—prior to October of 1985, the last measurement seems to have been in June—but instead generally determined how much caustic was on hand by keeping track of how much of the substance was delivered and how much should have been used in manufacturing. This latter figure was determined by multiplying the amount of IVP produced by a "standard usage figure" supplied by the engineering department.

It was through this method—adding for deliveries and subtracting for projected usage from June to October—that Smith calculated that there should have been 76,000 pounds of caustic left in the tank after the October production campaign. The actual reading was only 3,000 pounds. Alarmed by this discrepancy, Smith reported it to his supervisors, Bennett and Stan Kreminski, the plant engineer. Shortly thereafter, Kreminski told Smith to repeat his calculations, and if the discrepancy remained to "spread that usage out over the next few months." Joint Appendix at 143.[2]

Uncomfortable with such a procedure, Smith decided to "do my own—do an investigation to find out where it went." Joint Appendix at 143. His investigation consisted of a discussion with Victor Shtivelman, a plant engineer, and John Homewood, the maintenance supervisor. Shtivelman told Smith that there had been a "loss of material" and that a maintenance worker had "burned his shoes working in that area, and material leaking out of there." Joint Appendix at 169. Later that day, Smith asked Homewood to check his records for

any reports concerning the caustic soda storage area. Homewood came to Smith's office and produced a "work ticket" that stated "Steam line inside caustic dike is leaking." Joint Appendix at 585. More significant from Smith's perspective than the content of this work order,[3] however, are events he described surrounding his discussion with Homewood:

> [W]hen [Homewood] walked in to talk to me I noticed Mr. Bennett followed him outside my door whenever he was in there talking to me about this. He then looked at me, and I saw him, he looked at me and he went over into Stan's [Kreminski's] office, which is immediately from my office, he went in and slammed the door.

Joint Appendix at 172.

Less than a week later, Bob Courson, CCC's Personnel Director, and Bennett met with Smith. Bennett told Smith that he had been working too much overtime when he could be accomplishing more during regular hours, and therefore Bennett was going to reduce Smith's claim for overtime for the preceding two weeks. The next day, Smith sent the P.S.I. report to corporate headquarters; in this document Smith reported as consumed the entire 73,000 pound unfavorable discrepancy of caustic soda, without spreading out the usage as Kreminski had instructed. That same day Bennett gave Smith the "Interim Review and Improvement Program" memo described above.

Smith also claims to have discovered, in a manner similar to his calculation of the caustic soda "spill," that on certain days in March of 1986 the actual production on CCC's "A-furnace" exceeded the production indicated on the production reports prepared and sent to management in accordance with a directive from Bennett to one of Smith's subordinates. Although Smith did not realize it until after his em-

---

**2.** CCC presented evidence tending to show that, unbeknownst to Smith, caustic soda was used for a variety of other purposes which would account for the discrepancy Smith observed, that no "spill" had in fact occurred, and that therefore the suggestion to spread out the usage had no illicit motivation.

**3.** CCC introduced evidence tending to show that only steam, not caustic soda, leaks from a steam line.

ployment with CCC was terminated, the actual production believed by him to have occurred exceeded the production allowed under CCC's permit from Allegheny County. Smith testified that this excessive production created air pollution. This alleged overproduction occurred several days *after* Smith had received his unfavorable rating and been placed on the Performance Improvement Program.

Immediately after receiving his unfavorable rating and being placed on the P.I.P., Smith called Bob Courson, the CCC Personnel Director, to voice his disagreement with how he was being treated. Three days later, Smith met with Courson at corporate headquarters. Smith testified that at this meeting he told Courson that "the main reason that I had received [the unsatisfactory rating] had to do with my reporting of the caustic material on my [P.S.I.] report, and the fact that I hadn't changed the numbers." Joint Appendix at 263. Courson denied that Smith made this allegation to him.

At Courson's suggestion, Smith sent a number of documents to CCC President Thomas McConomy detailing his objections to his poor rating and placement on the P.I.P. With the first of these memos, dated March 24, 1986, Smith also enclosed two memos "to File" he had prepared, one in November of 1985 in response to his "Interim Review and Improvement Program," and one dated March 17, 1986, in response to his unsatisfactory rating. On April 15, 1986, Smith sent McConomy and Tisch yet another memo in response to the first of his interim P.I.P. reviews. All told, Smith wrote 25 single-spaced pages with the expressed purpose of responding to the actions taken against him; in none of these memos does he mention the caustic soda incident or the alleged overproduction on the A-furnace. In fact, only in his final letter to McConomy, dated two days prior to his termination, did Smith mention the spill, on page 9 of a twelve page letter, and then only citing it as "another reason why I received the 10/30/85 memo from Mr. Bennett." Joint Appendix at 485–86. McConomy returned this letter to Smith unopened. Moreover, Smith testified that he met with

McConomy personally and read into the record notes he had made immediately after these meetings purportedly recounting the conversations verbatim, Joint Appendix at 274–75, 278–81; in neither of these conversations did Smith discuss the "spill" or A-furnace. Smith testified at trial, however, that he informed McConomy that the production reports received by management understated actual production from the A-furnace during a number of days in March. Smith also sent a handwritten note to McConomy concerning the A-furnace approximately a week before his termination.

Smith acknowledged that he had no responsibility for reporting spills, emissions or inventory to any public agency and that he had not done so.

## II.  LAW OF EMPLOYMENT AT WILL IN PENNSYLVANIA

### A.  Federal Court Interpretation of State Common Law

This case concerns a matter of Pennsylvania state law, but we do not have the benefit of direct guidance from the Pennsylvania Supreme Court. We are nevertheless required to "predict the position which that court would take in resolving this dispute." *Robertson v. Allied Signal, Inc.*, 914 F.2d 360, 364 (3d Cir.1990). "Although some have characterized this assignment as speculative or crystal-ball gazing, nonetheless it is a task which we may not decline." *McKenna v. Ortho Pharmaceutical Corp.*, 622 F.2d 657, 661–62 (3d Cir.), *cert. denied* 449 U.S. 976, 101 S.Ct. 387, 66 L.Ed.2d 237 (1980).

### B.  The Public Policy Exception to the Employment at Will Doctrine

#### 1.  Geary

█ Under Pennsylvania law, it is an established general principle that in an employment relationship, an employer "may discharge an employee with or without cause, at pleasure, unless restrained by some contract." *Henry v. Pittsburgh & Lake Erie Railroad Co.*, 139 Pa. 289, 21 A. 157, 157 (1891); *see also Clay v. Advanced*

*Computer Applications*, 522 Pa. 86, 559 A.2d 917 (1989).

In *Geary v. United States Steel Corp.*, 456 Pa. 171, 319 A.2d 174 (1974), however, the Pennsylvania Supreme Court became one of the first courts in the nation to recognize, albeit in dicta, that this established general rule might admit of certain exceptions. *See* Comment, *The Role of Federal Courts in Changing State Law: The Employment At Will Doctrine in Pennsylvania*, 133 U.Pa.L.Rev. 227, 249 (1984). Geary, a salesman of tubular products used in the oil and gas industry, developed the conviction that one of his company's products—to be used under high pressure—had been inadequately tested and constituted a serious danger to anyone who used it. After expressing his concerns to his immediate superiors and being told to "follow directions," Geary took his case to the vice-president in charge of the product, and as a result the product was withdrawn from the market. Despite the "praiseworthiness of Geary's motives," *Geary*, 319 A.2d at 180, he was terminated.

While acknowledging that he was "beckoning [the Court] into uncharted territory," Geary urged that an exception to the employment at will doctrine was appropriate in his case because his dismissal was contrary to public policy. The Court disagreed, but it did so with language that has often been interpreted as implicitly recognizing that in appropriate circumstances such a cause of action might be maintained:

> It may be granted that there are areas of an employee's life in which his employer has no legitimate interest. An intrusion into one of these areas by virtue of the employer's power of discharge might plausibly give rise to a cause of action, particularly where some recognized facet of public policy is threatened.... [However, we] hold only that where the complaint itself discloses a plausible and legitimate reason for terminating an at-will employment relationship and no clear mandate of public policy is violated thereby, an employee at will has no right of

action against his employer for wrongful discharge.

*Id.* at 180.

In determining that Geary's situation did not justify such a cause of action, the Court relied upon two factors. First, Geary was not responsible for making judgments about product safety and did not have expertise in that area. As a result, the court concluded that the policy considerations counseling against recognizing a cause of action in Geary's case outweighed those counseling in favor of that course:

> Appellant's final argument is an appeal to considerations of public policy. Geary asserts in his complaint that he was acting in the best interest of the general public as well as of his employer in opposing the marketing of a product which he believed to be defective. Certainly, the potential for abuse of an employer's power of dismissal is particularly serious where an employee must exercise independent, expert judgment in matters of product safety, but Geary does not hold himself out as this sort of employee. So far as the complaint shows, he was involved only in the sale of company products. There is no suggestion that he possessed any expert qualifications, or that his duties extended to making judgments in matters of product safety. In essence, Geary argues that his conduct should be protected because his intentions were good. No doubt most employees who are dismissed from their posts can make the same claim. We doubt that establishing a right to litigate every such case as it arises would operate either in the best interest of the parties or of the public.... The everpresent threat of suit might well inhibit the making of critical judgments by employers concerning employee qualifications.

*Id.* at 178–79.

Second, the complaint itself demonstrated that Geary had bypassed his immediate superiors in order to present his concerns to higher officers, violating the chain of command: "The praiseworthiness of

Geary's motives does not detract from the company's legitimate interest in preserving its normal operational procedures from disruption." *Id.* at 180.

Geary's conduct held a potential for benefiting the public; indeed, it ultimately resulted in the withdrawal of the hazardous product from the market. He specifically argued that this potential public benefit was alone sufficient to justify legal protection for his conduct. Although the court acknowledged that the public would benefit from protecting the expression of informed opinions by employees regarding the safety of their employer's product, it rejected Geary's argument, taking note of the employer's interest in maintaining peace, order, and discipline in the workplace and of the public's interest in having the employer do so:

> In sum, while we agree that employees should be encouraged to express their educated views on the quality of their employer's products, we are not persuaded that creating a new non-statutory cause of action of the sort proposed by appellant is the best way to achieve this result. On balance, whatever public policy imperatives can be discerning [sic] here seem to militate against such a course.

*Id.* at 180.

#### 2. *Our Interpretation of Geary*

Despite the court's holding in *Geary,* Pennsylvania courts, federal district courts, and this court have all read *Geary* as creating a limited public policy exception to the employment at will doctrine. Two recent Pennsylvania Supreme Court cases cast some doubt on this interpretation of *Geary.* *See Clay,* 559 A.2d at 923 (Nix, C.J., concurring) ("Contrary to the Superior Court's view, this Court did not announce a cause of action for wrongful discharge in *Geary.*"); *Paul v. Lankenau Hospital,* 524 Pa. 90, 569 A.2d 346, 348 (1990) ("The Court [in *Geary*] specifically answered in the negative the central question of 'whether the time has come to impose judicial restraints on an employer's power of discharge.'"). However, in the absence of a *clear* statement by the Pennsylvania Su-

preme Court to the contrary or other persuasive evidence of a change in Pennsylvania law, we are bound by the holdings of previous panels of this court. Third Circuit Internal Operating Procedure 9.1. On several occasions, this court has held that *Geary* recognized a wrongful discharge tort for discharges that violate a clear mandate of public policy. *Woodson v. AMF Leisureland Centers, Inc.,* 842 F.2d 699 (3d Cir.1988); *Novosel v. Nationwide Ins. Co.,* 721 F.2d 894 (3d Cir.1983); *Bruffett v. Warner Communications, Inc.,* 692 F.2d 910 (3d Cir.1982); *Perks v. Firestone Tire & Rubber Co.,* 611 F.2d 1363 (3d Cir.1979). Moreover, the defendant has agreed that Pennsylvania law does recognize such a cause of action in certain circumstances.

#### C. Contours of the Public Policy Exception

Courts recognizing that *Geary* created a public policy exception to the employment at will doctrine in Pennsylvania have also noted that *Geary* demonstrated a strong concern for the prerogatives of the employer. As we have pointed out, the court in *Geary* feared that the "everpresent threat of suit might well inhibit the making of critical judgments by employers concerning employee qualifications." *Geary,* 319 A.2d at 179. Accordingly, the public policy exception to the employment at will doctrine has been interpreted narrowly. *See Bruffett,* 692 F.2d at 918; *Field v. Philadelphia Elec. Co.,* 388 Pa.Super. 400, 565 A.2d 1170, 1179 (1989).

In fact, while numerous wrongful discharge claims have been addressed by the Pennsylvania Superior Court, that court has found a cause of action to exist in only three cases. *See Field,* 565 A.2d at 1170 (employee, hired as expert in nuclear safety, discharged for making statutorily required report to NRC); *Hunter v. Port Authority of Allegheny County,* 277 Pa. Super. 4, 419 A.2d 631 (1980) (denial of employment to pardoned individual because of his assault conviction violates public policy embodied in Article I, Section 1 of Pennsylvania Constitution); *Reuther v. Fowler and Williams, Inc.,* 255 Pa.Super. 28, 386

A.2d 119 (1978) (termination for absence due to jury duty). Plaintiffs have been more successful in federal courts. *See, e.g., Woodson,* 842 F.2d at 699 (dismissal for refusal to serve liquor to intoxicated patron); *Novosel,* 721 F.2d at 894 (dismissal for refusal to participate in political lobbying); *Perks,* 611 F.2d at 1363 (dismissal for refusal to take polygraph test); *McNulty v. Borden, Inc.,* 474 F.Supp. 1111 (E.D.Pa.1979) (dismissal for refusal to participate in antitrust violations).

The courts have declined to set forth any general principles for determining when a plaintiff has alleged a violation of a "clear mandate of public policy." Indeed, this Court, like the *Geary* court, has explicitly "decline[d] 'to define ... the perimeters' of such a public policy exception in Pennsylvania." *Bruffett,* 692 F.2d at 918 (quoting *Geary,* 319 A.2d at 180). Instead, courts have been shaping the exception on a "case-by-case basis." *See Turner v. Letterkenny Federal Credit Union,* 351 Pa. Super. 51, 505 A.2d 259, 261 (1985); *Yaindl v. Ingersoll–Rand Co.,* 281 Pa.Super. 560, 422 A.2d 611, 617 (1980).

The cases that have recognized a public policy exception to the employment-at-will doctrine under Pennsylvania law have involved a "clear mandate of public policy" embodied in a constitutionally or legislatively established prohibition, requirement, or privilege. Thus, a discharge may violate a "clear mandate of public policy" if it results from conduct on the part of the employee that is required by law or from the employee's refusal to engage in conduct prohibited by law. "The public policy exception has been most frequently applied under Pennsylvania law when the discharge is a result of the employee's compliance with or refusal to violate the law." *Woodson,* 842 F.2d at 701–02. For example, in *Woodson,* where a barmaid was dismissed for refusing to serve an intoxicated patron, even after being ordered to do so, we recognized a cause of action, noting that a Pennsylvania statute prohibits what she refused to do. *See also Shaw*

*v. Russell Trucking Line, Inc.,* 542 F.Supp. 776 (W.D.Pa.1982) (dicta) (cause of action where trucker discharged for refusing to drive overweight loads); *McNulty,* 474 F.Supp. at 1111 (cause of action where discharge for refusal to participate in antitrust violations); *Field,* 565 A.2d at 1170 (cause of action where employee, hired as expert in nuclear safety, discharged for making statutorily required report to NRC).

Similarly, a discharge may violate a "clear mandate of public policy" if it results from the employee doing something he or she is privileged by law to do. *Novosel,* 721 F.2d at 894 (discharge for refusing to lobby state legislature on employee's behalf violates clear mandate found in the First Amendment and the Pennsylvania constitutional declaration that the "free communication of thoughts and opinions is one of the invaluable rights of man."); *Reuther,* 386 A.2d at 119 (cause of action where termination for absence due to jury duty).

■ We see little evidence in the Pennsylvania cases to date that an alleged public interest will be recognized as a "clear mandate of public policy" in the absence of a legislative or constitutional endorsement[4] in the form of a specific prohibition, requirement or privilege. Moreover, where the conduct causing the discharge is workplace conduct as opposed to conduct in an area "of the employee's life in which his employer has no legitimate interest," *Geary,* 319 A.2d at 180, *Geary* suggests that in the absence of such an endorsement, the Pennsylvania Supreme Court would be particularly reluctant to find an overriding public policy interest. In the case before us, however, we need not determine whether a "clear mandate of public policy" may exist in the absence of a specific directive legislatively or constitutionally imposed. Even if it may in some circumstances, we know from *Geary* that in the circumstances before us the public's inter-

4. We do not use "legislative endorsement" in a sense that excludes a prohibition, requirement or privilege established by an administrative agency pursuant to legislatively conferred authority. We have no occasion to address that issue here.

est in harmony and productivity in the workplace must prevail over the public's interest in encouraging an employee in Smith's position to express his "informed view."

As we have emphasized, the plaintiff in *Geary* argued that the public's interest in encouraging the expression of informed employee opinion regarding the quality of the employer's product was alone sufficient to immunize him from dismissal. The Court held that the public's countervailing interest in workplace harmony and productivity was more compelling, at least where the employee involved was not charged by the employer with the specific responsibility of protecting the public's interest in health and safety. Just as the *Geary* court rejected the argument that the creation of a cause of action was justified solely by the public's interest in encouraging the expression of informed employee opinion regarding the quality of the employer's *product,* we are confident that it would decline to create a cause of action based solely on the public's interest in encouraging such opinions regarding the quality of the employer's *operations.* Based on the *Geary* opinion, we would expect the Pennsylvania Supreme Court, before recognizing a cause of action on behalf of an employee who has complained to management about workplace conduct, to insist at least that the employee be charged either by the employer or by law with the specific responsibility of protecting the public interest and that he or she be acting in that role when engaging in the discharge causing conduct.

## III. *APPLICATION OF THE PUBLIC POLICY EXCEPTION TO SMITH'S CLAIM*

CCC appeals the district court's denial of its motions for judgment n.o.v. and a new trial. CCC argues: that Smith's claim fails as a matter of law; that the district court erred by instructing the jury not to consider whether the alleged hazardous emissions occurred; that the evidence is insufficient to support the verdict; and that the evidence is insufficient to support the award of punitive damages. Because we find that

Smith's claim fails as a matter of law, we need not address CCC's other arguments.

### A. Standard of Review

When a trial court confronts a claim of the kind at issue here, it must first determine whether termination for the reason alleged would violate a "clear mandate of public policy." This is an issue of law and our review of the resolution of it in the district court is plenary. *See Blum v. Witco Chemical Corp.,* 829 F.2d 367, 376 (3d Cir.1987) ("The district court predicted that the New Jersey courts would allow a cause of action for wrongful discharge based on age discrimination. This prediction is a determination of law and is reviewable by us under the plenary review standard.").

### B. The Legal Sufficiency of Smith's Claim

Smith does not claim that he was discharged for doing something that was required by positive law or for refusing to do something that was prohibited by positive law. Nor does he claim that he was discharged for engaging in conduct that was privileged under positive law. Rather, he claims that Pennsylvania and federal policy recognize the public's interest in a cleaner environment and that creating a cause of action in his favor will serve that interest by encouraging employees to express their concerns about the environmental effects of their employers' operations. Since Smith failed to adduce evidence that he had responsibility for assuring that toxic substances from the caustic soda tank or the A-furnace would not be inadvertently dispersed into the environment or for investigating evidence that such dispersals may have occurred, we are unable to distinguish his claim from the one made and rejected in Geary's case.

At trial, Smith presented evidence tending to show that he participated in the preparation of a document entitled "1984 Procedure Manual Hazardous Materials RCRA Transportation." Joint Appendix at 687–88. This document was not admitted as an exhibit, and the only evidence regarding its contents is the following testimony of Smith:

It had to do with the transportation, storage, and disposal of hazardous materials. Also had to do with the handling of all hazardous materials which we're handling in the plant. There are various types of hazardous materials.

App. 134. This was as close as Smith came to showing that he was charged with the responsibility of protecting against, or investigating possible evidence of, discharges from the caustic soda tank or the A-furnace.

Smith's job, insofar as relevant to these proceedings, was to maintain an inventory and periodically report it to management. His responsibilities did not include evaluating the environmental significance of the inventory figures he compiled for management and, indeed, he did not provide any such evaluation for the benefit of management. Smith reported to management his observation regarding the amount of material on hand; by his own account, he did not report his concerns about the possibility of a toxic leak and release [5] until months after the suspected events may have occurred and he was attempting to explain the adverse personnel actions against him.

Perhaps because his contemporaneous reports to management concededly did not mention the possibility of an environmental hazard, Smith chose to argue not that he was fired because he reported to corporate management a toxic leak and release, but rather that he was discharged for disclosing to corporate management that the plant management was engaged in a cover-up of an environmental hazard. Thus, in accordance with the plaintiff's theory, the judge charged the jury that "[i]n order to establish a claim of wrongful discharge, the plaintiff must [prove] by a preponderance of the evidence that he was discharged as a result of his disclosure to corporate management of an internal cover-up of emissions of hazardous materials into the environment." Joint Appendix at 463. But evaluation of the performance of plant management was, if anything, further removed from Smith's responsibility and expertise than the prevention or investigation of discharges of the sort he feared had occurred.

We are unable to distinguish this case from *Geary;* therefore, we will reverse the judgment in Smith's favor and direct the entry of judgment for CCC. We do not say that Smith's motives were not "praiseworthy," *Geary,* 319 A.2d at 179, but only that in these circumstances no "clear mandate of public policy" requires that his conduct be immunized.

### C. Pennsylvania's Whistleblower's Law

■ Smith argues that the Pennsylvania Whistleblower Law, 43 Pa.Stat.Ann. §§ 1421 *et seq.,* enacted shortly after Smith was terminated, should be taken to be conclusive evidence that a clear mandate of public policy requires us to recognize a cause of action in this case. The Whistleblower Law creates a private cause of action for any employee who suffers an adverse employment action "because the employee or a person acting on behalf of the employee makes a good faith report or is about to report, verbally or in writing, to the employer or appropriate authority an instance of wrongdoing or waste." 43 Pa. Stat.Ann. § 1423(a). We find no persuasive indication, however, that this statute was thought to codify previously existing law. Based on *Geary,* we conclude that it did not.

### IV. CONCLUSION

We will reverse the judgment of the district court and remand with an instruction that judgment be entered in favor of CCC.

---

**5.** Kreminski testified to a general CCC policy that anyone observing an environmental accident should report it to supervision and if necessary to higher management. We do not view this as the kind of specific responsibility the *Geary* Court had in mind in distinguishing Geary's situation. Moreover, Smith's actions in simply reporting his inventory observations would not appear to satisfy the requirements of this general policy.