**In re GIRARD MEDICAL CENTER, f/k/a James C. Giuffre Medical Center, Debtor.**

**Bankruptcy No. 90–10804S.**

United States Bankruptcy Court, E.D. Pennsylvania.

June 28, 1991.

Memorandum on Reconsideration July 19, 1991.

Joseph B. Finlay, Jr., Astor, Weiss & Newman, Philadelphia, Pa., for debtor.

Gary M. Schildhorn, Adelman Lavine Gold and Levin, Philadelphia, Pa., for Creditors' Committee.

James J. O'Connell, Asst. U.S. Trustee, Philadelphia, Pa.

940

Arnold P. Borish, Hangley, Connolly, Epstein, Chicco, Foxman & Ewing, Philadelphia, Pa., for claimant.

## MEMORANDUM

DAVID A. SCHOLL, Bankruptcy Judge.

Dr. Jay H. Davidson ("the Claimant") filed a Proof of Claim (No. 19)[1] in the amount of $3,846.25 for "any unpaid benefits" arising out of his allegedly wrongful discharge as the Debtor's "Chief of Medicine" pursuant to a written Memorandum of January 22, 1990, from William Vazquez, the Debtor's President ("Vazquez").

Vazquez testified for the Debtor that he was hired in April, 1988, at a time when the Debtor was in danger of losing its accreditation as a medical facility from the Commonwealth and had lost the confidence of its patient community. Pursuant to a study by a state commission conducted in connection with the Debtor's licensure, Vazquez, at a meeting of the Debtor's Patient Services Committee ("the PSC") of November 27, 1989, recommended dismissal of the Claimant as Chief of Medicine (although not as a staff member). The PSC agreed to this action, with a directive that Vazquez handle the dismissal in such a fashion as to avoid professional discredit to the Claimant in light of his association of over 40 years with the Debtor.

Unfortunately, on January 22, 1990, before Vazquez had been able to reach a resolution with the Claimant, the Claimant engaged in a boisterous dispute with the Debtor's Medical Executive Committee ("the MEC") resulting from his refusal to name a staff member whom he intended to discipline. Therefore, the MEC directed Vazquez to dismiss the Claimant immediately, thus resulting in the Memorandum noticing his termination.

Thereafter, at a meeting of the Debtor's full Board of Directors of April 16, 1990, of which the Claimant received no prior no-

tice, the Board ratified the Claimant's discharge.

The Debtor's Medical Staff Bylaws contained two provisions relative to dismissal of parties holding positions such as the Chief of Medicine. The first, ¶ 11.2.1(c), provides that removal "may be initiated by the Board ... pursuant to Section 9.3." The Second, ¶ 9.3.1, provides that removal for grounds unrelated to professional conduct "may be accomplished in accordance with the usual personnel policies of the hospital." The Debtor's corporate Bylaws state that the dismissal of any such official is subject to review upon written request by the party dismissed within five days after the Board action is taken.

The Claimant argues that his employment was terminated without his being given procedural rights afforded him by the two sets of Bylaws. He did not argue that the Debtor lacked substantive basis for its actions. The damages claimed are his salary of $50,000 annually from January 22, 1990, to the date of his resignation from the Debtor's staff in September, 1990.

Pennsylvania law provides that "[a]bsent a statutory or contractual provision to the contrary, the law has taken for granted the power of either party to terminate an employment relationship for any or no reason." *Geary v. United States Steel Corp.*, 456 Pa. 171, 175, 319 A.2d 174, 176 (1974). *See, e.g., Carlson v. Arnot–Ogden Memorial Hospital*, 918 F.2d 411, 414 (3d Cir.1990); *Smith v. Calgon Carbon Corp.*, 917 F.2d 1338, 1341–42 (3d Cir.1990), *cert. denied*, — U.S. —, 111 S.Ct. 1597, 113 L.Ed.2d 660 (1991); and *In re Frymire*, 96 B.R. 525, 533–34 (Bankr.E.D.Pa.), *vacated in part & aff'd in part sub nom. Frymire v. PaineWebber, Inc.*, 107 B.R. 506 (E.D.Pa.1989). This body of law is known as the "at will doctrine." *Id.* It is applicable here because the Claimant has not alleged that he was employed under a contract of a definite duration, which is an exception to the doctrine. *See Frymire*,

---

1. He also filed another Proof of Claim (No. 20) in the amount of $1,936.00 "plus unliquidated claims for employment termination." The parties agreed to allow Claim No. 20 in the amount of $1,859.00, and to allow Claim No. 19 in whatever amount this court determined that the Claimant was due for any wrongful termination of his employment found by this court.

*supra,* 96 B.R. at 534–37. The only other exception to the doctrine as a controlling principle of (lack of) employee rights is a class of circumstances where it can be found that the employee's discharge was against public policy. *Smith, supra,* 917 F.2d at 1342–46; and *Geary, supra,* 456 Pa. at 184, 319 A.2d at 180. However, *Smith, supra,* notes that in only a few instances have Pennsylvania courts sustained wrongful discharge claims based on public policy considerations. 917 F.2d at 1343.

The class of cases which we find most analogous to the instant case involve circumstances where employees have attempted to assert that company policies, as delineated in certain employee or personnel handbooks, "constituted promises rising to the level of contractual obligation[s]." *Ramsbottom v. First Pennsylvania Bank, N.A.,* 718 F.Supp. 405, 409 (D.N.J.1989). The employees in these cases have argued that their respective employers' failure to abide by the policies or procedures set forth in handbooks gives rise to a cause of action of the employees for breach of contract. *See, e.g., id.; Morosetti v. Louisiana Land & Exploration Co.,* 522 Pa. 492, 564 A.2d 151 (1989); *Banas v. Matthews Int'l Corp.,* 348 Pa.Super. 464, 502 A.2d 637 (1985) (en banc); and *Richardson v. Charles Cole Memorial Hospital,* 320 Pa.Super. 106, 466 A.2d 1084 (1983).

In *Ramsbottom,* a New Jersey district court applied Pennsylvania law to an employee's claim that his employer's distribution of a policy manual bound the employer to contractually adhere to the policies and procedures outlined therein. The court viewed the "at will presumption" as a status where there already exists a "contract between the [parties], the terms of which were that [the employee] could be discharged for any or no reason." 718 F.Supp. at 409, quoting *Martin v. Capital Cities Media, Inc.,* 354 Pa.Super. 199, 216, 511 A.2d 830, 838 (1986), *allocatur denied,* 514 Pa. 643, 523 A.2d 1132 (1987). Furthermore, the court construed that presumption to mean that "neither party is bound to follow any particular procedure or

decision making process in terminating the employment." 718 F.Supp. at 409.

The court in *Ramsbottom* distinguished the "handbook cases" from those which apply either of two exceptions to the at will doctrine, where there is a contract or if there is a contrary public policy, viewing the theory involving handbook policies as one intended to "supplant the at will rule." *Id.* This analysis, implying that, in handbook cases, it is reasoned that the handbook constitutes a contract which replaces the presumption, is supported by the holding of *Morosetti, supra,* where the Supreme Court of Pennsylvania stated that, for handbook policies to be binding against an employer, the elements of basic contract law must be proven. Specifically, the *Morosetti* court held that, for an employee to establish that policies expressed in a handbook evidence contractual obligations, it must be shown that the employer intended to offer such policies to the employee, perhaps as an "inducement for employment," and that the employer intended to be bound by them. 522 Pa. at 495, 564 A.2d at 152–53. Likewise, the court in *Ramsbottom* characterized the test for determining whether an employee handbook provided contractually enforceable obligations as one aimed at determining intent, *i.e.,* whether the circumstances surrounding the employee's hiring and distribution of the manual, or whether actual evidence contained in the handbook, manifested an intention to convert the "at will presumption" to a contractual arrangement defined by the provisions of the policy manual. 718 F.Supp. at 410. Thus, *Ramsbottom* concludes that courts should inquire as to whether a reasonable person would have thought his employment was at will, or would have interpreted the circumstances and the provisions contained in a handbook as evidence of the employer's intent to replace the at will rule. *Id.* at 409, citing *Scott v. Extracorporeal,* 376 Pa.Super. 90, 545 A.2d 334, 337 (1988). In sum,

"it is the intention of the parties which is the ultimate guide, and, in order to ascertain that intention, the court may take into consideration the surrounding circumstances, the stipulation of the par-

ties, the objects they apparently have in view, and the nature of the subject matter of the agreement."

*Martin, supra,* 354 Pa.Super. at 216–17, 511 A.2d at 839, quoting *Price v. Confair,* 366 Pa. 538, 542, 79 A.2d 224, 226 (1951).

■ However, if no intention to be bound to the provisions of an employee handbook can be ascertained, the handbook is generally viewed as a "unilateral act" by the employer, the terms of which were not bargained for by the parties. In such a circumstance, the failure to adhere to the handbooks's terms does not give rise to a cause of action for breach of an employment contract. *See, e.g., Richardson, supra,* 320 Pa.Super. at 108–09, 466 A.2d at 1085.

In *Banas, supra,* the court declined to apply an implied contract theory, based on rights allegedly granted to an employee through an employee handbook, because the handbook in that case did not contain, "expressly or by clear implication, any just cause provision" which would "take [the plaintiff's] case out of the settled employee-at-will rule." 348 Pa.Super. at 483–86, 502 A.2d at 648. However, in a footnote, the *Banas* court suggests that a discharge characterized by an employer's breach of procedural provisions outlined in an employee's handbook could give rise to a claim. *Banas,* 348 Pa.Super. at 485 n. 10, 502 A.2d at 647–48 n. 10.

■ This language in *Banas* appears to recognize, to a limited extent, the potential existence of a cause of action for wrongful discharge based on the employer's breach of handbook procedures. However, this language must be read together with the tests discussed in *Morosetti* and *Ramsbottom* for determining when a handbook confers rights to an employee and is binding against an employer. It is necessary to ascertain when certain procedures are provided, not as rights to an employee, but as mere internal policy addressing what might occur should a given occasion arise. *See Morosetti,* 522 Pa. at 495, 564 A.2d at 153.

In this case, it is not an "employee handbook" which has been alleged to give rise to the claim, but rather Bylaws. Bylaws appear to us to be less significant as evidence of an employer's intent to "offer" the terms therein as substitutes for the terms of "at will" employment than a handbook, because they are not usually drafted in the context of negotiation with employees or distributed to employees. There is no evidence that the instant Bylaws were the subject of negotiations or were distributed to employees.

■ The distinction between handbooks, which are typically given to employees, and Bylaws, which generally are maintained internally by a corporate entity, is illustrated by considering a problem with the enforceability of employee manuals or handbooks. The principle of contractual mutuality would require the conclusion that both the employer and the employee are bound by the handbook provisions. However, the likelihood that they may go unread or uncomprehended places a burden on the employee to establish that they were in fact relied upon. *See Darlington v. General Electric Co.,* 350 Pa.Super. 183, 204, 504 A.2d 306, 316 (1986). If employee handbooks place such a burden on employees, Bylaws certainly do as well. As the court in *Darlington* points out, consistent with *Ramsbottom, Morosetti,* and *Banas,* in order for a discharged employee to have a cause of action for wrongful discharge, the employee must show that, prior to termination, the employee reasonably relied on procedures which the employer communicated would be followed prior to termination. *See Darlington,* 350 Pa.Super. at 203, 504 A.2d at 316.

■ When the court asked the Claimant at the hearing of June 19, 1991, why he did not follow the hearing procedure in the corporate Bylaws if he was so intent on contesting his discharge from the outset, he stated that this procedure was included in only the Corporate Bylaws and that he was unaware of these procedures in the Bylaws until well after his discharge. It is this alleged right to a notice and an opportunity for a hearing before the Debtor's Board which is the principal violation of the established procedures for termination

which the Claimant alleges that the Debtor violated. However, in light of his lack of knowledge of their existence, it is clear that the Claimant did not rely on them as a condition of his employment. Therefore, the Claimant's attempt to analogize the Debtor's promulgation of the Bylaws to a contract guaranteeing him certain procedural protections fails. Furthermore, on their face, the Bylaws in issue are at best ambiguous as to whether they provide any rights to the Claimant. The Medical Staff Bylaws do not command that removal of an officer *must* be initiated by the Board, but only that it *may* be so initiated. It is quite logical to assume that situations will arise (and perhaps this was one) where dismissal must be effected immediately and only Board ratification is obtainable. *See In re Orfa Corp. of America*, 115 B.R. 799, 805–06 (Bankr.E.D.Pa.1990).

Ultimately, the Medical Staff Bylaws reference the "usual policies" of the Debtor in instances where, as here, the officer's discharge is unrelated to professional capabilities. The Claimant has not proven what the "usual policies" of the Debtor were. The Corporate Bylaws enunciate such policies only as to the applicable hearing procedure, which the Claimant admittedly never invoked. We cannot accept the Claimant's explanation that he "knew" that only the Board could discharge him, such that he could disregard the termination notice from Vazquez as ineffectual. It is certainly logical to assume that a corporate President has authority to act on behalf of a corporation. The Claimant apparently thought some validity was attached to Vazquez's actions, as he ceased action in the capacity of the Debtor's Chief of Medicine thereafter, although he apparently remained as a staff physician until he resigned from that capacity in September, 1990.

Finally, in *Banas, supra*, 348 Pa.Super. at 482, 502 A.2d at 646, the court quotes *Yaindl v. Ingersoll–Rand Co.*, 281 Pa.Super. 560, 577, 422 A.2d 611, 620 (1980), as establishing that a court deciding a wrongful discharge case

"must weigh several factors, balancing against appellant's interest in making a living, his employer's interest in running its business, its motive in discharging appellant and its manner of effecting the discharge, and any social interests or public policies that may be implicated in the discharge."

Upon consideration of these factors, it does not seem that the Claimant's claim for wrongful discharge is well-taken. His arguments were strictly procedural. He never advanced a contention that *either* his record as Chief of Medicine *or* his stubborn refusal to comply with the MEC's reasonable request and then an outburst at the MEC meeting of January 22, 1990, did not warrant his discharge. *But see In re Fonseca*, 110 B.R. 191, 195–96 (Bankr. E.D.Pa.1990) (procedural rights should be considered apart from the underlying merits). The fundamental difficulty with the Claimant's position is his inability to prove a violation of his procedural rights.

We therefore conclude that the "at will doctrine" precludes the Claimant's cause of action against the Debtor and that the presence of the Bylaws does not advance this cause. An appropriate Order denying Claim No. 19 will therefore be entered.

## MEMORANDUM ON RECONSIDERATION

On July 8, 1991, Dr. Jay H. Davidson ("the Claimant"), filed and served a Motion, apparently based upon Bankruptcy Rules 9023 and 3008, requesting that we reconsider our Memorandum ("the Memo") and Order of June 28, 1991, denying a Proof of Claim (No. 19) in which he sought damages arising out of his allegedly wrongful discharge as the Debtor's "Chief of Medicine" pursuant to a written Memorandum of January 22, 1990, from the Debtor's President. The Motion was accompanied by a lengthy Memorandum of Law. Assuming *arguendo* that it is appropriate to effect a plenary review of our prior decision on such a motion, *see In re Motor Freight Express*, 91 B.R. 705, 710–11 (Bankr.E.D.Pa.), *appeal dismissed*, 94 B.R. 346 (E.D.Pa.1988), we are readily able to determine that our prior decision was correct, even in the face of the Claimant's elaborate submissions arguing to the contrary. Therefore, in order to

allow the estate to preserve its assets by not expending further resources in support of the Debtor's objection to this relatively small ($3,846.25) claim, we are prepared to deny the Motion without the necessity of scheduling it for a hearing.

In the Memo, op. at 943, we concluded that application of the "at will doctrine," which we found to be a well-established principle of Pennsylvania law, precluded the Claimant's cause of action. In the course of the Memo, *id.* at 942–43, we indicated that the discharge of the Claimant was not effected in violation of the procedures set forth in the Debtor's Medical Staff Bylaws ("MS Bylaws") or Corporate Bylaws ("Corp. Bylaws"), or even both taken together. However, we further concluded that, even if the Claimant's discharge had been effected in derogation of the procedures outlined in these Bylaws, the Bylaws did not constitute a contract between the Debtor and the Claimant which the Claimant could enforce against the Debtor. *Id.* at 942.

The Claimant's submissions rely heavily upon *Berberian v. Lancaster Osteopathic Hospital Ass'n, Inc.*, 395 Pa. 257, 149 A.2d 456 (1959), in support of the principle that the Debtor's MS Bylaws do in fact create a binding contract between the Claimant and the Debtor. In *Berberian*, a doctor challenged his removal from the staff of a private hospital in derogation of provisions of the hospital's corporate Bylaws which allowed the suspension of a physician *"only after adequate hearing and thorough investigation."* 395 Pa. at 262, 149 A.2d at 458 (emphasis in original). Finding that the hospital was the only facility at which the plaintiff doctor could conveniently practice, the court restrained the hospital from depriving the doctor of staff privileges "except after a hearing duly had with a right of appeal in the plaintiff as provided in the by-laws of the hospital's staff," in view of the provision of a presuspension hearing requirement cited in the Bylaws. 395 Pa. at 261, 266, 149 A.2d at 457, 460.

At the outset, we note that *Berberian* does not involve the *employment* of a doctor by a hospital. It involves the right of a doctor to *staff privileges* at a hospital. Therefore, the *Berberian* court does not discuss or even raise the "at will doctrine" as an issue. The instant contested matter, by way of contrast, involves *solely* an issue of employment. The Memorandum of January 22, 1990, discharging the Claimant expressly stated that it did *not* affect the Claimant's clinical privileges, the sole matter at issue in *Berberian*.

This difference appears sufficient in itself to distinguish *Berberian* from the instant matter. The principles set forth in *Berberian* have not been applied in *any* employment case, even those involving hospital employers. *See, e.g., Carlson v. Arnot–Ogden Memorial Hospital*, 918 F.2d 411, 413–16 (3d Cir.1990); *Paul v. Lankenau Hospital*, 524 Pa. 90, 569 A.2d 346 (1990); *Schechter v. Watkins*, 395 Pa.Super. 363, 577 A.2d 585, *allocatur denied*, 526 Pa. 638, 584 A.2d 320 (1990); *Richardson v. Charles Cole Memorial Hospital*, 320 Pa.Super. 106, 466 A.2d 1084 (1983). It is apparent to us that the exclusion of a doctor from staff privileges at a hospital, which could seriously impede the doctor's ability to continue to practice medicine, is far more significant to a doctor than a doctor's retention of a position on the administrative staff of a hospital. Concomitantly, it is much more significant to a hospital—particularly one facing the severe preservation-of-licensure issue confronted by the Debtor in late 1989 and early 1990—to be able to instill leadership in which it has full confidence than to be concerned about the practice of a particular doctor. In light of its re-assertion of the "at will doctrine" in the context of employment of hospital personnel, we therefore predict that the Pennsylvania Supreme Court would engage in the analysis which appeared in the Memo, op. at 940–943, and would not apply the principles of *Berberian*, to the strictly employee-employer dispute at issue.

However, assuming *arguendo* that it would be proper to apply the principles of *Berberian* to the instant dispute, we do not believe that to do so would affect the outcome. While *Berberian* has never been overruled or discredited, its progeny has

resulted in little success for parties seeking to apply it. In *Posner v. Lankenau Hospital*, 645 F.Supp. 1102, 1107 (E.D.Pa.1986), the court observed that

> [t]he Supreme Court of Pennsylvania has held that it will not grant physicians broader contractual rights beyond those explicitly stated in the bylaws. *Adler v. Montefiore Hospital Association of Western Pennsylvania*, 453 Pa. 60, 311 A.2d 634 (1973), *cert. denied*, 414 U.S. 1131, 94 S.Ct. 870, 38 L.Ed.2d 755 (1974) (plaintiff physician had no entitlement to perform laboratory procedures merely because he was a member of the medical staff).

*Accord McMorris v. Williamsport Hospital*, 597 F.Supp. 899, 916–17 (M.D.Pa.1984); and *Hoberman v. Lock Haven Hospital*, 377 F.Supp. 1178, 1189–90 (M.D.Pa.1974).

Moreover, in *Miller v. Indiana Hospital*, 277 Pa.Super. 370, 376, 419 A.2d 1191, 1194 (1980), the Pennsylvania Supreme Court held that a mere "de minimis deviation from the provisions of the hospital bylaws" was not intended by *Berberian* as the type of bylaws violation which would give rise to judicial intervention.

 In his Motion, the Claimant states that

> Article 11.2.1(c) of the Medical Staff By-laws required that such removal be "initiated" by Girard's Board of Directors, ... and limited the power of Girard's Executive Director and Medical Staff Executive Committee to "recommending" such removal to Girard's Board. Article 12.7 of the Corporate Bylaws required (a) notification to the Chief of Medicine of any Board decision concerning his removal, (b) review of any such removal decision by an *ad hoc* committee appointed by Girard's Board chairman, and (c) the opportunity for the Chief of Medicine to have a hearing before the *ad hoc* committee.

The Claimant's erroneous editorialization of Article 12.7 of the Corp. Bylaws is the most serious misreading of these crucial sections of the Bylaws. Article 12.7 provides in pertinent part as follows:

> 12.7 *Medico–Administrative Employees.* Termination of employment by the corporation of any person who is a member of the Medical Staff and employed by the corporation in a medico-administrative position shall be subject to review by, and at the written request of the affected person delivered to the President within five business days of notice of termination, a hearing before an *ad hoc* committee appointed by the Chairman and consisting of members of the Board of Directors and members of the Medical Staff....

Nowhere is notification of any medical staff employee of removal required by this Article, much less any requirement that the employee receive notice prior to removal. Rather, Article 12.7 merely provides a process which is to be followed if and when an employee makes a written request of same to the President within five days of the termination of employment.

We have carefully reviewed the correspondence between the Claimant's counsel and the Debtor's representatives between March 16, 1990, and May 22, 1990. At no time did the Claimant's counsel request a hearing concerning the grounds for his termination from employment by the Debtor. Even in his letter of May 22, 1990, with the Bylaws in hand, the closest that the Claimant's counsel comes to taking an action necessary to trigger Article 12.7 is his inaccurate statement that the Article "does not require a written request (or any request at all) for a review of the termination by an *ad hoc* committee." No request for a review is, however, made. Had such a request been made, the review process set forth in Article 12.7 may well have been accorded to the Claimant. The Debtor might have waived the five-day period in light of the Claimant's lack of notification of the date of the Board's action.

On the other hand, the Debtor could make a strong argument that the claimant's request for review should have come within five days of, or at least some reasonable time period after, January 22, 1990. There was no indication to the Debtor that the Claimant had any dispute about his termination until the first of his counsel's

letters to the Debtor on March 16, 1990, almost two months after the termination had occurred and a replacement for the Claimant was in all probability in place. We find this delay of any sort of protest of his termination of employment to have been grossly unreasonable on the part of the Claimant.

■ In any event, we fail to find the Debtor's failure to give the Claimant notice of the Board meeting at which his discharge was ratified to be a requisite violation of rights "explicitly stated in the [Debtor's] bylaws." *Posner, supra,* 645 F.Supp. at 1107.

■ Though admittedly to a less severe degree, we also find that the Claimant's counsel has inappropriately editorialized Article 11.2.1(c) of the MS Bylaws, which provide as follows:

> (c) Term of Office: A Division Director or Department Chief shall serve commencing with his appointment, and until his successor is chosen. Removal of a Division Director or Department Chief from office may be initiated by the Board, acting upon its own recommendation, or upon the recommendation of the Executive Director or Executive Committee. Removal from office shall be accomplished pursuant to Section 9.3.

It is certainly not "explicitly stated" in this Article that the removal of a Department Chief can occur only upon Board action. It is not clear that Board "initiation" means that the Board must make the final decision. We adhere to our observation in the Memo, op. at 942, that the MS Bylaws are at best ambiguous as to whether they provide any rights to the Claimant. It is logical to assume that situations, such as the instant one, will arise where dismissal must be effected immediately and only Board ratification is obtainable.

The MS Bylaws, at Article 9.3.1., which is specifically referenced in Article 11.2.1, specifically state only that the "usual policies" of the Debtor apply in instances where, as here, an officer's discharge is unrelated to professional capabilities. The Claimant has still not proven or suggested what the "usual policies" of the Debtor were. The Corp. Bylaws, as indicated at pages 941–42 *supra,* set forth only the applicable hearing procedure, which the Claimant admittedly never invoked. If there was any breach of the procedures outlined in the Bylaws (and we can find none), it was at most a "de minimis deviation" that would not give rise to the application of the principles set forth in *Berberian.*

Finally, the argument of the Claimant, elaborate as it is, is revealing in its failure to dwell at all upon the merits of the Claimant's discharge from employment. While the Claimant's counsel cannot be faulted for putting the Claimant's best (and perhaps only) foot forward, this court's opportunity to review the merits of the grounds for termination at the hearing on the Objection of June 19, 1991, and our conclusion that just grounds for the Claimant's discharge clearly existed, becomes relevant in several ways. The Claimant's failure to act promptly after his termination or to ever actually request a hearing appears tactical. It appears that he suspected that his protests lacked substantive merit and would fail to prevent his discharge, even after a hearing. Therefore, he was (and remains) obliged to attempt to latch onto a technical, procedural failure of the Debtor to adhere to a scrap of its admittedly poor-drafted Bylaws as the sole basis for his claim.

■ Firstly, as we noted in the Memo, op. at 943, the merits are a relevant factor to be considered in any wrongful discharge case. Secondly, as we observed in the foregoing paragraph, the lack of the Claimant's substantive merit to contest his discharge is relevant to assessment of his good faith, which we question.

■ Finally, the merits are relevant to the issue of damages. The Claimant appears to assume that the natural consequence of his convincing us that the Debtor committed a procedural error in the termination process would be to reward him with the full compensation payable for filling the position from which he was removed. We beg to differ. In *Berberian, supra,*

the only relief granted to the aggrieved doctor was an order requiring the defendant hospital to provide the doctor a hearing before his privileges were removed. No prayer for damages by the *Berberian* plaintiff is mentioned or granted.

If the Claimant is correct that the Debtor deprived him of his right to a pre-termination hearing, then it is only a hearing regarding the merits of his termination before an *ad hoc* Board Committee to which he is entitled. Having heard the merits of the reasons for the Claimant's discharge, it appears to us most unlikely that he would have prevailed, or would now prevail, at such a hearing. If and only if he *did* prevail would the claimant be entitled to the back-pay damages that he seeks. The Claimant therefore appears to raise a contingent claim for such back-pay damages, the value of which, pursuant to 11 U.S.C. § 502(c), having heard the matter on its merits, we do not hesitate to estimate at zero.

It is true that a claimant's deprivation of procedural rights gives rise to an action against the party depriving the claimant of such rights "for nominal damages without proof of actual injury." *Carey v. Piphus,* 435 U.S. 247, 266, 98 S.Ct. 1042, 1054, 55 L.Ed.2d 252 (1978). However, in a case challenging an improper denial of a hearing, "substantial damages should be awarded only to compensate actual injury." *Id.* We conclude that the Claimant suffered no actual injury by reason of any procedural deficiency on the part of the Debtor, because he was discharged by the Debtor for just cause. Of course, we also find that no procedural deficiency in his discharge occurred, which renders him ineligible for nominal damages either.

We therefore express no hesitancy whatsoever in entering an Order denying the Claimant's request that we reconsider our Order of June 28, 1991, disallowing Claim No. 19. An appropriate Order will be promptly entered.

## ORDER ON RECONSIDERATION

AND NOW, this 19th day of July, 1991, upon careful review of the Motion and accompanying materials submitted by Dr. Jay H. Davidson, in connection with his request for reconsideration of our Order of June 28, 1991, sustaining the Objections of the Debtor to Proof of Claim No. 19 filed by the said Claimant, it is hereby ORDERED as follows:

1. The Motion for reconsideration is DENIED.

2. Proof of Claim No. 19 is DISALLOWED.